NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0632n.06

**Nos. 08-5973 and 08-6369**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

**Sep 20, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JANICE F. CURRY, | ) | |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| EATON CORPORATION and BROADSPIRE | ) | COURT FOR THE WESTERN |
| SERVICES, INC., | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellees/Cross-Appellants. | ) | |

Before:        BOGGS and COOK, Circuit Judges; COLLIER, Chief District Judge.[*]

PER CURIAM. In this consolidated appeal, Janice F. Curry ("Curry") appeals from two orders of the district court: one granting summary judgment to Eaton Corporation and Broadspire Services, Inc. ("Eaton" and "Broadspire," respectively) in her ERISA denial-of-benefits claim, and one denying her subsequent Motion to Alter, Amend, or Vacate that summary judgment order. The appellees have appealed the district court's decision to extend the time permitted to Curry to file her notice of appeal.

Because the district court did not abuse its discretion in analyzing the considerations relevant to granting a motion to extend the time permitted for a party's filing of a notice of appeal, and because the appellees did not act arbitrarily and capriciously in determining that Curry had not met

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

the definition of "disabled" under Eaton's long-term disability plan, we affirm the district court in all respects.

**I**

The Eaton Corporation Long Term Disability Plan ("Plan") is a self-insured plan administered by Eaton. Broadspire is the Plan's claims administrator. Under the Eaton Plan, a participant may be eligible for monthly long-term disability ("LTD") benefits if the participant cannot work due to an illness or injury, the participant has a covered disability as defined by the Plan, and the participant is under the continuous care of a physician who verifies to the satisfaction of the claims administrator that the participant is totally disabled.

The Plan has a two-tiered definition of "covered disability":

You are considered to have a covered disability . . . under the Plan if:

• During the first 24 months of such disability, inclusive of any period of short term disability, you are totally and continuously unable to perform the essential duties of your regular position with the Company, or the duties of any suitable alternative position with the Company, and

• During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which you are, or may become, reasonably well fitted by reason of education, training or experience—at Eaton Corporation or elsewhere.

The Plan further provides that:

Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are disabled. Objective findings are those that can be observed by your physician through objective means, not just from your description of the symptoms.

The Plan also requires periodic certification of the participant's disability status, which can include independent medical examinations and/or functional capacity tests.

Curry, who lives in Edmonton, Kentucky, was employed by Eaton Corporation from October 17, 1985, until July 7, 1997, as an assembly line machine operator. In 1993 to 1994, she began suffering low-back pain which, in mid-1996, led her to see neurosurgeon George Raque. Shortly after seeing Dr. Raque, Curry applied for and was awarded short-term disability benefits under the Plan with diagnoses of cervical-disc herniation, cervical- and lumbar-disc bulges, and fibromyalgia.

Curry received short-term disability benefits under the Eaton Corporation Short Term Disability Program from July 8, 1996, through January 3, 1997. She then applied for LTD benefits under the first-tier criteria of the LTD Plan, and those benefits were approved effective January 4, 1997. Curry was thereafter approved for LTD benefits under the LTD Plan's second-tier criteria. Pursuant to a clause in the Plan requiring long-term disability claimants to apply for Social Security Disability benefits, Curry applied for and was awarded benefits by the Social Security Administration ("SSA"), which found her to have been totally disabled since June 27, 1996. In response to a request from the Claims Administrator for an update of her condition, Curry submitted a Resources Questionnaire dated June 4, 2003, and a Medical Provider List dated June 13, 2003. She indicated that she could cook, do dishes, do laundry, and dust, but that she did not drive and instead was driven by her husband. She also indicated that she had trouble sleeping due to pain. Curry stated that her last visit with Dr. Feltner was May 24, 2003, but that she could not remember her last visit with Dr. Raque.

On November 13, 2003, Vaughn Cohan, a neurologist, reviewed Curry's claim file and concluded that she was capable of sedentary work. On November 18, 2003, Russell Superfine, an internal medicine specialist, reviewed Curry's claim file, coming to the same conclusion as Dr. Cohan. After receiving those reports, Broadspire arranged for an independent Functional Capacity Evaluation ("FCE") of Curry on December 18, 2003. Laura Goulbourne, a physical therapist, reviewed the Cohan and Superfine reports, conducted an in-person evaluation of Curry, and concluded that Curry qualified for the "sedentary" work category.

In a letter dated April 23, 2004, Broadspire informed Curry that, based upon a review of the records provided, she was capable of returning to work, she was not disabled under the "any occupation" standard as defined by the LTD plan, and her LTD benefits would cease as of June 1, 2004. Curry formally appealed Broadspire's decision to discontinue her benefits on October 18, 2004.

By letter dated January 28, 2005, to Broadspire, Curry enclosed medical documentation and an affidavit purporting to support her appeal. The affidavit, dated October 15, 2004, attested to Curry's work experience, her disability, her pain and side effects from pain medication, her experience with the FCE, and her daily activities and treatment. The medical documentation included updated records of her treating physicians: Dr. Feltner's notes from December 27, 2003, through October 14, 2004; Dr. Raque's notes from July 30, 2004, through September 17, 2004; a "residual functional capacity assessment" by Dr. Raque dated October 4, 2004; an evaluation by Dr. Victor Tirabasso dated August 19, 2004; and a report by Curry's own vocational expert, Stephen Schnacke, dated November 29, 2004.

Broadspire subsequently engaged physicians specializing in physical medicine, rehabilitation, and neurosurgery to review Curry's file. These physicians, like Drs. Cohan and Superfine before them, concluded that the objective findings of Curry's treating physicians were not sufficient to support a finding of "disabled" under the Plan's "any occupation" standard. In a letter dated April 20, 2005, Broadspire informed Curry that, after a review of the file, its original decision to discontinue LTD benefits was upheld.

By letter dated October 10, 2005, Curry requested reconsideration of Broadspire's decision. She again forwarded updated notes from her treating physicians, and again Broadspire had those notes reviewed by its own doctors. After receiving her request for reconsideration, Broadspire sent Curry's file to Dr. Eddie Sassoon, a pain-management specialist; Dr. Sheldon Meyerson, a neurosurgeon; Dr. Tamara Bowman, an internal-medicine specialist; Dr. Jamie Wancier, a neurosurgeon; Dr. Lucy Cohan, a specialist in physical medicine and rehabilitation; and to two physicians employed by the Medical Review Institute of America ("MRIoA")—a neurologist and an orthopedic surgeon—whose identities were kept confidential according to MRIoA policy. All of the file reviewers came to the same conclusion as that reached earlier by Drs. Vaughn Cohan and Russell Superfine: that insufficient objective evidence had been provided to meet the Plan's definition of "disabled," because the evidence was consistent with a capacity to perform sedentary work.

Broadspire also had Curry's file evaluated by Chau Nguyen-truong, a Broadspire "Field Care Manager," who conducted an Employability Assessment Report ("EAR") and a Labor Market Survey ("LMS") to determine what job skills Curry possessed and whether there were positions

available in her local area that she could perform, given those job skills and her medical condition. Nguyen-truong, using the reviewing doctors' recommendation that Curry be limited to sedentary work, identified several positions in the Louisville and Cincinnati areas that were open and that he believed Curry could occupy. However, both the EAR and the LMS indicated that Louisville and Cincinnati were both within a 50-mile radius of Curry's home in Edmonton, Kentucky, when in fact the former is approximately 125 miles away and the latter is approximately 225 miles away.

Eaton, as plan administrator, issued a final determination dated January 6, 2006, upholding Broadspire's denial of continued LTD benefits after May 31, 2004. The letter indicated the following basis for determination:

> Ms. Curry's medical records do not support a finding of disability. Ms. Curry's medical records reflect that she appears to suffer from a number of medical conditions, including chronic back pain, fibromyalgia, thyroid disease and depression.

> With respect to depression, the Disability Plan provides that, in order to be deemed disabled due to mental illness, the determination must be made by a psychiatrist. Ms. Curry's records do not reflect any treatments by a psychiatrist.

> None of the records provide evidence of Ms. Curry's inability to perform sedentary work.

> Although the medical records make reference to fibromyalgia, there are no physical findings or history documented to support or describe the diagnosis.

> With respect to her back pain, the reviewer notes that she has MRI evidence of degenerative disc disease, but that such degenerative disc disease occurs with aging. In addition, physical examinations related to back pain have been sporadic and mostly negative with only a few descriptions of limited range of motion. Ms. Curry has indicated that the pain is not significant enough to require surgery.

> Although Ms. Curry's physicians have opined that she is unable to work, they do not provide any objective clinical medical evidence to support these opinions.

Further, each medical reviewer of Ms. Curry's information concluded that the objective information did not support a finding that Ms. Curry was unable to perform any occupation. A March 8, 2004 functional capacity evaluation reflected an ability to work at the sedentary level. The independent medical reviewers retained by the Plan Administrator concluded that, based on the available medical information, Ms. Curry would not be disabled from any occupation on June 1, 2004 . . . . The independent medical reviewers' conclusions were based on their review of the medical records.

Having exhausted her internal appeals, Curry filed suit on January 4, 2007, seeking a reinstatement of her LTD benefits. On October 30, 2007, the district court granted summary judgment to Eaton and Broadspire, holding that the basis for their January 6, 2006, denial letter had not been arbitrary and capricious. On June 24, 2008, Judge Russell denied Curry's motion, filed under Federal Rule of Civil Procedure 59(e), to alter or amend his order granting summary judgment.

On July 22, 2008, counsel for Curry apparently attempted to file a notice of appeal with the Western District of Kentucky's electronic docketing system, the use of which is mandatory in that district. Although he received notification that his payment of the filing fee had been accepted, he did not receive final confirmation that the filing itself had been accepted and, unbeknownst to him, the notice of appeal was not docketed. The deadline for filing the notice of appeal expired on July 24, 2008. On July 29, 2008, Curry filed a Motion for Leave to File Notice of Appeal, which Judge Russell granted on October 8, 2008. Eaton and Broadspire timely appealed that order.

Before us now are appeals from Judge Russell's order granting summary judgment to Eaton and Broadspire, his order denying Curry's Rule 59(e) motion to alter or amend, and his order granting Curry's motion for leave to file notice of appeal.

**II**

The sole basis for the appellees' appeal in No. 08-6369 is their argument that the district court abused its discretion in granting Curry's Motion for Leave to File Notice of Appeal.

Ordinarily, a party's notice of appeal in a civil case must be filed with the district clerk within 30 days after entry of the judgment or order from which the party is appealing. Fed. R. App. P. 4(a)(1)(A). Compliance with the time limits of that rule is mandatory and jurisdictional. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 203 (1988); *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994). However, a district court is empowered to grant an extension of up to thirty additional days in which to file a notice of appeal if "a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires" and "that party shows excusable neglect or good cause." Fed. R. App. P. 4(a)(5)(A). We review a district court's grant of such an extension for abuse of discretion. *Baker v. Raulie*, 879 F.2d 1396, 1399 (6th Cir. 1989).

Where, as here, the motion for extension of time is filed after the time for filing the notice of appeal has run, the motion may only be granted upon a showing of "excusable neglect;" showings of "good cause" are relevant only when the motion is filed before the expiration of the initial appeal period. *Zack v. United States*, 133 F.3d 451, 453 n.1 (6th Cir. 1998) (citing Fed. R. App. P. 4(a)(5) advisory committee's note (1979 Amendment)).

"Neglect," in this context, encompasses both simple, faultless omissions to act and omissions caused by carelessness. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993); *see also United States v. Thompson*, 82 F.3d 700, 702 (6th Cir. 1996). Whether such neglect is "excusable" is fundamentally an equitable determination, taking account of all relevant

circumstances surrounding the party's omission. *Pioneer*, 507 U.S. at 395. These relevant circumstances include (1) the danger of prejudice to the other party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. *Ibid.* Should a district court find excusable neglect, the court must then examine the questions of prejudice and bad faith; if there is any indication of bad faith or any evidence of prejudice to the appellee or to judicial administration, the district court may then choose to exercise its discretion and deny the requested extension. *Thompson*, 82 F.3d at 702 (citing *Pioneer*, 507 U.S. at 397-98).

In this case, the district judge was well within his discretion in finding that the relevant circumstances justified an extension of the deadline for notice of appeal. The district judge found no significant danger of prejudice to the appellees, and indeed the appellees did not argue that any such danger existed; moreover, the delay was for a relatively brief period of time, corrected as soon as the appellant's counsel discovered the error, and there was no sign of bad faith. Ultimately, the appellees argue only that the appellant's counsel should have understood that the response he received from the district court's electronic docketing system was not a confirmation of filing. We reverse for abuse of discretion, however, only where we have a "definite and firm conviction that the trial court committed a clear error in judgment." *United States v. City of Warren*, 138 F.3d 1083, 1095 (6th Cir. 1998). Given that the district court is in a far superior position to understand the challenges of those seeking to comply with its electronic docketing system, we lack such a conviction that this presents a sufficiently "extraordinary" case for reversal.

**III**

A

We "review de novo the decision of a district court granting judgment in an ERISA disability benefit action based on an administrative record." *Glenn v. MetLife*, 461 F.3d 660, 665 (6th Cir. 2006), *aff'd*, *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008). If the plan administrator is vested with discretion to interpret the plan, we review the administrator's denial of benefits under the "arbitrary and capricious" standard. *Ibid.* at 666 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989)). Though highly deferential, this standard nevertheless requires "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues" and does not require us merely to rubber-stamp the administrator's decision. *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Ultimately, we will uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn*, 461 F.3d at 666 (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)). This is true regardless of whether an equally rational interpretation is offered by the plan participant. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005).

In pertinent part, the plan here at issue reads:

You are considered to have a covered disability . . . under the Plan if:

[. . .]

During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for

- 10 -

> compensation or profit for which you are, or may become, reasonably well-fitted by reason of education, training or experience—at Eaton Corporation or elsewhere.

Once the Administrator makes a judgment as to whether a claimant has a "covered disability," its determination is entitled to deference unless it is arbitrary and capricious. That is, if Eaton's determination that an individual can perform any occupation "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," it will not be disturbed. *See Glenn*, 461 F.3d at 666 (internal quotation marks and citation omitted).

B

Notwithstanding the deference afforded a plan administrator under arbitrary-and-capricious review, courts must evaluate potential conflicts of interest and consider them as factors in determining whether the decision to deny benefits was arbitrary and capricious. *Gismondi*, 408 F.3d at 298. For ERISA purposes, a conflict of interest is present when the same entity both funds the plan and evaluates the claims. *Glenn*, 128 S. Ct. at 2348; *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009). In such cases, the arbitrary-and-capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest. *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir. 1998). Accordingly, for example, a long history of biased claims administration may render the conflict more important, but where a claims administrator has taken "'active steps to reduce potential bias and to promote accuracy,' the conflict 'should prove less important.'" *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 392-93 (6th Cir. 2009) (quoting *Glenn*, 128 S. Ct. at 2351).

Curry concedes that the plan document in this case "grants the plan administrator and/or its claim administrator, Broadspire, the discretion to determine eligibility for benefits and to construe any and all terms of the plan," and that, as a consequence, the proper inquiry for the trial court was whether the benefit determination at issue was arbitrary or capricious. Curry nevertheless argues that the plan is both self-funded and retains the ultimate decision-making authority over whether to deny or approve a claimant's benefits, placing it in the position contemplated by our conflict-of-interest rules. The district court agreed, but discounted any potential conflict because Curry had not provided evidence that Eaton's denial of LTD benefits was actually motivated by its alleged conflict of interest.

A lack of evidence that a purported conflict of interest motivated a particular benefits decision at issue has, in the past, been sufficient in our circuit to avoid consideration of that conflict in conducting arbitrary-and-capricious review. We have previously rejected an argument that the apparent conflict of interest that exists when an administrator both decides whether an employee is eligible for benefits and pays those benefits requires the conclusion that the administrator *necessarily* has a conflict in a specific case. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). In *Cooper*, the employer's long-term disability plan made both the initial determination that the employee did not qualify and, after referring her to independent consulting physicians, denied her internal appeals. When Cooper asserted that a district court was required to take that conflict into account when evaluating the plan administrator's actions, the district court noted that an ERISA plaintiff is required "not only to show the purported existence of a conflict of interest, but also to

provide 'significant evidence' that the conflict actually affected or motivated the decision at issue."

*Ibid.* We affirmed, pointing out that

> Cooper provided no evidence whatsoever that LINA's denial of benefits was motivated by its alleged conflict of interest. She simply asserted and continues to assert that because LINA both decides whether an employee is eligible for disability benefits and then pays those benefits, LINA necessarily has a conflict. But such conclusory statements, without more, do not suffice to render the district court's determination incorrect.

*Ibid.*

As was the case in *Cooper*, Curry has merely asserted that the nature of the plan-administrator relationship is sufficient to find a conflict of interest, without providing any indication that the denial of his benefits specifically was motivated in any part by that conflict. We therefore apply "ordinary" arbitrary-and-capricious review to this case.

C

We turn now to the Plan's treatment of the medical evidence in this case, beginning with the evidence submitted by Curry herself.

1

Generally speaking, a plan may not summarily reject the opinions of a beneficiary's treating physician, but must instead give reasons for adopting an alternative opinion. *Elliott v. Metro. Life Ins.*, 473 F.3d 613, 620 (6th Cir. 2006). Giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious. *Ibid.* Plan administrators, however, "are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825

(2003). Though ERISA and federal regulations under the Act "require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials[,] . . . these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Ibid.* (citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1 (2002)). To that extent, a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion. *See, e.g.*, *Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 473 (6th Cir. 2005).

The Plan provides that "[o]nce you are approved for benefits, you will be required to periodically submit updated medical information regarding your continuing disability for benefit payments to continue." Under the heading "When Long Term Disability Benefits End," the Plan further indicates that "[i]f you have a covered disability and begin receiving long term disability benefits, your benefits will end when . . . [y]ou no longer have a covered disability under the Plan, as determined by the Claims Administrator . . . [or] [t]he first day for which you are unable to provide satisfactory evidence of a covered disability." As indicated above, this evidence must also be "objective."

Curry argues on appeal that the record was "replete" with objective evidence of her limitations, including (1) positive straight-leg-raising tests discussed by her treating physician, the functional-capacity evaluator, and the pain-management specialist she saw at Spring Valley Hospital; (2) her MRI results showing a cervical-disc herniation and disc bulges; (3) materials from her neurologist, Dr. Raque, in which he concluded that Curry could stand or sit daily at a work station

- 14 -

for less than two hours, could not drive, and would be expected to miss five or more days of work per month; and (4) findings of multiple physicians that she experienced muscle spasms and tenderness. According to Curry, the appellees' decision to terminate her long-term benefits was arbitrary and capricious because they did not accord appropriate weight to her treating physicians' opinions and objective findings of impairment, and the file reviewers that Eaton relied upon to evaluate her claim did not address and explain their rejection of Curry's treating physicians' opinions.

Under *Elliott* and *Black & Decker*, Eaton is not entitled to simply ignore the opinions provided by Curry's treating physicians, but it can resolve conflicts between those opinions and the opinions of its own file reviewers if it provides reasons—including a lack of objective evidence—for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review of Curry's claim. In its final decision letter, Eaton indicated that its determination to deny Curry's appeal was "based on the definition of disability in the Disability Plan, the need for objective, clinical medical findings to support a finding of disability, a review of Ms. Curry's medical records, and the conclusion of the independent medical professionals retained by the Plan Administrator to assist in making this determination." It further noted that "[a]lthough Ms. Curry's physicians have opined that she is unable to work, they do not provide any objective clinical medical evidence to support these opinions. Further, each medical reviewer of Ms. Curry's information concluded that the objective information did not support a finding that Ms. Curry was unable to perform any occupation." We conclude that this determination was not arbitrary and capricious.

Curry's evidence of her physical limitations comes from four sources: Dr. William Feltner, her osteopath; Dr. George Raque, her neurologist; Dr. Victor Tirabasso, a pain-management specialist she saw at Spring View Hospital; and her own affidavit. We discuss each in turn.

The record contains two reports from Dr. Feltner, one dated September 23, 2002, and the other dated June 22, 2003. Both reports include a diagnosis of fibromyalgia. On the former occasion, Dr. Feltner's findings included decreased range of motion in Curry's back, while on the latter occasion he described her as having "muscle tenderness/dysphoria."

Broadspire's initial peer review of Dr. Feltner's findings was done by Dr. Russell Superfine, an internal-medicine specialist, on November 13, 2003. Dr. Superfine reviewed the report of June 22, 2003, and Dr. Feltner's notes of an office visit of May 24, 2003. Dr. Superfine's notes acknowledge that Dr. Feltner's objective findings included muscle tenderness and dysphoria, but pointed out that on May 24, 2003, "[h]er musculoskeletal exam revealed that she had normal range of motion." Dr. Superfine concluded that, while her diagnosis was fibromyalgia, the submitted physical and diagnostic findings "would not support a functional impairment which would preclude the claimant from performing the duties of any occupation." Dr. Superfine indicated that Curry could at least perform sedentary activities, with limitations that could not be determined from the materials submitted, and advised that additional relevant documentation would include a complete physical examination and a functional-capacity evaluation.

Broadspire then had Dr. Feltner's notes reviewed by Dr. Sheldon Meyerson, a neurologist, as part of a comprehensive review Dr. Meyerson performed of Curry's entire medical file. With respect to the diagnosis of fibromyalgia specifically, Dr. Meyerson advised that:

> Fibromyalgia is a very difficult diagnosis to substantiate, usually requiring a rheumatologist, which is a specialty that does deal in this condition and delves deeply into the history and physical findings to substantiate that diagnosis. In the claimant's case, the diagnosis was essentially mentioned several times by the primary care physician with no physical findings or significant history to support the diagnosis. She had myalgias and some muscle tenderness mentioned. There is no significant information regarding the fibromyalgia that would prevent her from performing any type of work in the records reviewed.

Dr. Feltner's reports were also reviewed on November 9, 2005, by Dr. Tamara Bowman, an internal medicine specialist and endocrinologist. Dr. Bowman indicated that Curry had been diagnosed with fibromyalgia and given a Class 5 level of physical restriction by Dr. Feltner, but that "there is no documentation of objective clinical findings to support this degree of impairment." She further noted that Curry

> has been noted on occasion to have some diffuse muscle tenderness, but there is no documentation of decreased range of motion, objective muscle weakness, signs of radiculopathy, sensory examination findings, joint deformity or effusion, or synovitis. Her gait is documented to be normal. There is no evidence of collagen vascular disease, rheumatoid arthritis, or other inflammatory arthritis in the claimant. There is no documentation of positive serologic markers of inflammation. . . . There is no documentation of objective physical examination findings, laboratory anomalies, or diagnostic study results to support a functional deficit in the claimant that would preclude work.
>
>        . . . Therefore, from an internal medicine standpoint, there are insufficient objective clinical findings documented to support a level of functional impairment that would render the claimant unable to perform "any occupation" from 06/01/04 onward.
>
>        . . . From an internal medicine standpoint, there is no documentation of objective clinical findings to support any restrictions or limitations on the part of the claimant.

- 17 -

Broadspire also had Dr. Feltner's records reviewed by an orthopedic surgeon as part of its review of Curry's final appeal.[1] As part of the orthopedic surgeon's review, he indicated that Curry "has a diagnosis of fibromyalgia but none of her clinical exams mention multiple trigger points which is a hallmark of this disorder. There is no record of an evaluation by a rheumatologist."

Taken together, the reviews of Dr. Superfine, Dr. Meyerson, Dr. Bowman, and the MRIoA orthopedic provided the appellees with sufficient reason to discount the findings of Dr. Feltner. While Dr. Feltner did provide objective findings to support his diagnosis under the Plan's definition by indicating that Curry had decreased range of motion and muscle tenderness, the reviewing physicians' reports address those findings head-on by pointing out that (1) Dr. Feltner's office notes dated May 24, 2003, indicated that Curry had a normal range of motion, and (2) the amount of muscle tenderness, as documented, did not appear to be sufficient to restrict Curry from sedentary work. Thus, Eaton did not arbitrarily ignore Dr. Feltner's findings, but rather considered them in light of contradictory conclusions that its own reviewers came to after the reviewers themselves took into account the objective data.

Dr. Raque first saw Curry on July 8, 1996, on referral from Dr. Feltner. At that time, Dr. Raque's notes indicate that Curry had a history of lower-back pain, but had recently been experiencing more constant pains in her back and persistent pain in her neck and shoulder. However, according to the doctor's notes, "[s]he has a good range of motion of her neck without obvious

---

[1] The orthopedic surgeon reviewer was an employee of the Medical Review Institute of America ("MRIoA"), which Broadspire retained to conduct independent reviews. Consistent with MRIoA's policy, the orthopedic surgeon's identity was kept confidential; neither Curry nor the appellees were told his or her name.

discomfort. Straight-leg raising test is negative to 90 degrees bilaterally, and she has good range of motion of her back without discomfort."

Dr. Raque ordered an MRI exam for Curry, which apparently demonstrated a disc herniation at the C6-7 level and a bulge at C5-6. On September 9, 1996, he reported that Curry had a "strong desire to avoid surgery" and would not consider any invasive treatment, and that she "remain[ed] disabled from the standpoint of work because of her cervical and lumbar disc disease." On November 11, 1996, he noted that Curry's "exam remains non-focal. In particular there is no motor deficit, reflex change or evidence of long track signs." In terms of the possibility of her returning to work, Dr. Raque wrote that "it is becoming more and more apparent that there is nothing we are going to do that is going to get this woman in a shape that she could go back to work because of the *heavy nature* of her job." (emphasis added).

On December 26, 1996, Dr. Raque filled out a "Disability Continuation Statement" for Eaton in which he indicated that Curry had a diagnosis of cervicodorsal spondylosis, but that she had improved and was ambulatory. Further, Dr. Raque indicated in a "Physical Limitation Questionnaire" on that same date that Curry could stand or walk for four hours at a time, eight hours total per day, could sit for an unlimited amount of time, could frequently bend and occasionally squat, kneel, climb, and reach.

Curry's next visit with Dr. Raque appears to have been on March 8, 1999, when the doctor described her as "more or less the same." On examination, she showed "an absent right Achilles reflex and a positive straight leg raising test at 60º and decreased [range of motion] of her back." At

some point thereafter,[2] Dr. Raque filled out an "Attending Physician's Statement that classified Curry as having a Class 5 physical impairment, "severe limitation of functional capacity/incapable of sedentary work." On July 30, 2004, Dr. Raque examined Curry and found that "reflexes are 2+ and equal. Motor testing is normal. Sensation is intact. She has no long track signs. She has positive straight leg raising test on the left, negative on the right. Gait is normal." Dr. Raque sent her for an MRI of her lumbar spine, which was conducted on August 9, 2004, and found degenerative disc disease and bulging discs in her lumbar spine.

Dr. Raque reviewed the MRI results and, in a note dated August 12, 2004, indicated that the findings might explain Curry's symptoms of low-back pain and leg pain but that they were "certainly not anything that is dangerous." On a follow-up visit dated October 4, 2004, Dr. Raque conducted a physical examination, and found her "reflexes [were] 2+ at the knees and 1+ at the ankles. There [was] no clonus. Motor testing in the lower extremity [was] normal and sensation [was] intact." Also on October 4, 2004, Dr. Raque filled out a "Residual Functional Capacity Assessment" that indicated Curry could stand daily at a work station for less than two hours, sit for less than two hours, work with a sit or stand option with short breaks for less than four hours, and had various other physical restrictions. However, no indication was given on this form of the objective bases for these conclusions. Curry's penultimate visit with Dr. Raque occurred on December 27, 2004, when she was described as "more or less the same." On physical examination, Dr. Raque's notes read

---

[2] The Attending Physician's Statement is undated, but it indicates that the most recent date Curry was treated was March 8, 1999.

"reflexes are 2+ and equal. Motor testing is normal. Sensation is intact. She has no long tract signs. Gait is normal. Straight leg raising test is negative."

Finally, Curry saw Dr. Raque on August 22, 2005, at which time she was again described as "more or less the same." At that time, she was again examined physically, with a physical exam finding "reflexes are 1+ at the knees and ankles. There is no clonus. Motor testing is normal. Sensation is intact. She has no long tract signs and she has a negative straight leg test at 90 degree[s] bilaterally. Her gait is normal." Interestingly, Dr. Raque's notes also disclose that, on this occasion,

> [w]e discussed the possible return to work but apparently the plant she worked at is closed now. They replaced what she used to do with handling truck parts, therefore I do not think that she is able to go back to work. Even sedentary jobs will require prolong[ed] sitting which she is incapable of. I believe [it] is my opinion therefore based on reasonable medical probability that the patient will never return to work.

Thus, Dr. Raque's objective findings appear to have included MRI results disclosing a cervical herniation in 1996, an additional MRI in 2004 that showed degenerative disc disease in her lumbar spine, and a series of relatively unremarkable physical exam findings. Although Dr. Raque's work-limitation recommendations grew progressively more severe over the years, it is unclear what these limitations were based on other than Curry's subjective complaints of pain—which, under the terms of the Plan, were insufficient to support a finding of disability.

Broadspire's reviewing neurologists appear to have considered the objective evidence relied upon by Dr. Raque and come to a different conclusion. On November 18, 2003, neurologist Dr. Vaughn Cohan discussed the notes of her most recent visit to Dr. Raque (that of July 14, 2003), including findings relating to her reflexes, motor testing, straight-leg testing, and gait, and pointed out that "[t]here is no evidence of impaired cognitive function or impaired function of the upper

extremities and there is no evidence of problems with gait, coordination, or endurance for performing work while seated at a desk." Dr. Cohan indicated that Curry would be appropriately restricted to sedentary work, but that she was not precluded from performing "any occupation."

Dr. Meyerson, in a comprehensive file review dated April 15, 2005, agreed. Dr. Meyerson appears to have been provided with both MRI reports and all of the office notes submitted by Dr. Raque (along with the notes of Curry's other treating physicians). During a chronological recap of Curry's treatment, Dr. Meyerson points to Dr. Raque's March 1999 findings that Curry had a positive straight-leg-raising sign of 60 degrees and diminished range of motion in her back as being "the first and just about the only significant physical findings in the entire review of the chart." Dr. Meyerson pointed out that Curry's relatively infrequent visits to Dr. Raque demonstrated that there was "no pattern of pain being severe enough to require frequent visits," and that, generally, the physical examinations had been negative. Having reviewed all the documents, Dr. Meyerson concluded that the information did not support a functional impairment from "any occupation."

Curry's neurology diagnoses were also addressed by Dr. Jaime Wancier in still another file review, this one dated November 7, 2005. Dr. Wancier, who was also provided with Dr. Raque's notes, the MRI results, and various other portions of Curry's file, generally did not address the bases for her diagnosis; rather, Dr. Wancier appears primarily to have simply related Curry's history of treatment and concluded that the information provided did not preclude Curry from performing the activities of a sedentary occupation. However, Dr. Wancier did make one pertinent observation with respect to the MRI findings, noting that, while the August 2004 exam revealed degenerative disc disease, stenosis, and disc bulges, those findings "are to be considered by many to be within normal

limit[s] for a person of this age bracket. Review of the literature reveals that in MRIs of similar findings, the overwhelming majority of patients were asymptomatic."

The final file review concerning Curry's neurological diagnoses was performed by an MRIoA reviewer. That reviewer also concluded that there was no documentation to support a finding of disability, and that, based on the objective evidence, Curry should be able to perform sedentary work. According to that reviewer, the MRI findings would not preclude Curry from working at a sedentary occupation, as "[n]o evidence of a herniated disc is reported, and there is only mild to moderate spinal stenosis. Neuroforaminal stenosis is present at only one level and reported as mild."

As was the case with her diagnosis of fibromyalgia, Curry's neurological diagnoses appear to have been addressed rationally by the reviewing physicians and, by extension, by Eaton. Although a 1996 MRI demonstrated a herniated cervical disc, it does not appear that her complaints were of neck pain; indeed, at the time of her 1996 MRI she was described as having a good range of motion of her neck, and Dr. Raque's later reports focused on her problems with her lower back. The more recent MRI of the lumbar spine, meanwhile, appears to have shown some degeneration and bulging, but, at least in one reviewer's opinion, not more than might be expected for someone of the claimant's age. The other objective evidence, in the form of Dr. Raque's physical exam findings, appears not to have supported a finding that Curry was disabled from "any occupation" in that the findings were mostly normal, or at least of unspecified significance. In its final denial letter, Eaton concluded:

> With respect to [Curry's] back pain, the reviewer notes that she has MRI evidence
> of degenerative disc disease, but that such degenerative disc disease occurs with
> aging. In addition, physical examination related to back pain have been sporadic

and mostly negative with only a few descriptions of limited range of motion. Ms Curry has indicated that the pain is not significant enough to require surgery.

Taking into consideration the file reviewers' discussions of Dr. Raque's findings, Eaton's conclusions are supported by substantial evidence and cannot be said to have been arbitrary and capricious.

In addition to seeing Drs. Feltner and Raque, Curry also saw Dr. Victor Tirabasso, of the Spring View Hospital Pain Clinic, for a consultation on August 19, 2004. On that date, Dr. Tirabasso conducted a physical examination, with the following findings:

> Examination of the back reveals no palpable bony abnormalities and no significant tenderness to palpation. The erector spinae muscles are symmetric and nontender. The sacroiliac joint on the left side is somewhat tender, but nontender on the right. Bowstring test is essentially negative bilaterally. Straight leg test causes pain at approximately 75 degrees on the right and approximately 65 degrees on the left. These symptoms are radicular in nature. Bowstring test is negative bilaterally. Strength against resistance to hip flexion, knee flexion and knee extension, and dorsi and plantar flexion show good symmetry and strength and no problems with range of motion or elicitation of symptoms. The knee joint reflexes are brisk and symmetric. Of note – the patient does have swelling in her left ankle. She had an ankle fracture with ORIF performed years ago and there is persistent swelling and decrease[d] range of motion in this ankle.

Dr. Tirabasso concluded that Curry had multilevel degenerative disc changes, ligamentum flavum hypertrophy with lumbar facet hypertrophy, and L5-S1 bilateral neuroforaminal stenosis.

Broadspire had Dr. Tirabasso's findings reviewed by Dr. Meyerson, who discussed the findings and pointed out that the straight-leg sign "is not significant at the degrees [Dr. Tirabasso] mentions." Dr. Wancier's review of November 7, 2005, agreed, indicating that Dr. Tirabasso "did not mention any significant range of motion deficits." Dr. Sassoon's review of April 19, 2005 also took Dr. Tirabasso's findings into account, concluding that they revealed "no significant loss of

motion [or] strength of some severity as to preclude sedentary functional activity." Again, these conclusions would seem to go directly to the question of whether the objective evidence described by Curry's physician was sufficient to meet the standard for disability contained in the Plan, and provide a rational basis for concluding that it did not.

Curry also submitted an affidavit in support of her claim for continued disability, dated October 15, 2004, in which she described her subjective experiences with her disability. By the plan's terms, however, such subjective complaints are specifically excluded from consideration in evaluating whether a claimant is disabled. Therefore, Eaton was not required to consider the affidavit, and was not arbitrary and capricious in according it little or no weight.

2

In addressing the Plan physicians' evaluations of her medical condition, Curry initially argues that the reports of the independent medical reviewers are "suspect," because they "were prepared by employees of Broadspire," and that in this particular case skepticism is particularly appropriate because (1) the appellees provided these reviewers with copies of the prior denial letters and (2) the reviewers did not address and explain their rejection of Curry's treating physicians' opinions. Curry provides no analysis, however, of why providing a copy of the denial letter to the reviewing physicians would be particularly damaging or would prevent these physicians from fairly evaluating her medical status.

Additionally, Curry appears to be simply wrong in terms of her assertion that the reviewers did not address her treating physicians' opinions. As indicated above, the reviewers appear to have squarely discussed the *objective* findings of Curry's treating physicians. While they may not have

specifically referred to particular comments opining as to appropriate restrictions for Curry, it seems clear that the file reviewers came to their own conclusions based on the evidence they were provided by the Plan for consideration, including the physical exam findings of Drs. Feltner, Raque, and Tirabasso. To the extent that the limitations proposed by Curry's treating physicians were based on anything else, such as Curry's own reports of pain, they were outside the scope of the materials that the plan required to be considered.

Curry also argues that Broadspire's reviewing physicians should have been accorded less weight because our circuit recognizes that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." *Elliott*, 473 F.3d at 620 (internal quotations marks and citations omitted). This conflict is heightened, Curry argues, by the fact that none of the peer reviewers actually examined her, but rather relied upon the record provided to them by Broadspire. However, the Supreme Court has also said that a patient's *treating* physician may also have an incentive to make a finding of "disabled." *Black & Decker*, 538 U.S. at 832. Indeed, in *Black & Decker* the Supreme Court considered these dueling motivations before ultimately refusing to read into ERISA cases a "treating physician rule" by which a plan administrator would be required to accord a patient's treating physician's opinion special deference. *Id.* at 831-32. Moreover, we have said that conclusory allegations of bias with respect to a plan-chosen reviewer, without statistical evidence that the reviewer *consistently* opined the claimants were not disabled, could not permit a conclusion that relying on that reviewer's opinion was arbitrary and capricious. *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005). Curry attempts to support

her assertion of bias by pointing to the results of "a simple Westlaw search" that found multiple examples of other cases in which the reviewing physicians hired by Broadspire provided peer reviews. As Curry herself points out, however, "[i]t must be remembered that the above cases are only the reported cases, and do not include any additional peer reviews requested of these physicians by Appellees." The question under *Black & Decker* and *Kalish* is not, after all, whether a given reviewer has worked for the plan administrator before, but rather whether he or she is so consistent in making a finding of "not disabled" that those findings become evidence of bias. Curry provides no statistical analysis to put her "simple Westlaw search" into context; we have no idea if the cases she cites represent a consistent trend on the reviewers' part to find "not disabled," or if they merely reflect the fact that the reviewers have seen a large number of files.

Curry contends that the file reviewers made critical credibility determinations without examining her personally, but it is uncertain what credibility determinations would even be relevant under the Plan's definition of "disabled." To the extent that a finding of "disabled" can only be based on objective evidence, and subjective complaints of pain and physical limitation are not considered, credibility would not seem to make a difference one way or another. In her opening brief, Curry argues that "[s]ome of Appellants' reviewers made credibility determinations regarding Appellant's complaints of pain based solely upon the medical records they reviewed, and reliance upon such conclusions in the absence of a physical examination may be considered inadequate." However, she neither identifies the specific instances of such determinations, nor explains their impact on her particular case. In her reply brief, she indicates that "Drs. Myerson [sic] and Wancier suggested that the objective medical findings did not support the symptoms reported by Curry and

her physicians, apparently making credibility determinations without having examined" her. This may be true, insofar as the doctors' conclusion that the objective medical findings did not support the symptoms reported by Curry could lead one to believe that they considered her subjective complaints incredible, but such a credibility finding is merely incidental under the plan at issue. Regardless of whether the reviewing physicians believed that the discrepancy between objective and subjective evidence was due to Curry's deceit or, for example, a dearth of testing, the plan only asks whether sufficient objective evidence exists to support a finding of "disabled." Nothing in the record indicates that Eaton, Broadspire, or any of the reviewing physicians relied upon a credibility determination at all in coming to that conclusion.

Curry additionally argues that "the two initial in-house reviews [by Drs. Cohan and Superfine], the Functional Capacity Evaluation, and the in-house vocational reports were all prepared by individuals provided select information," effectively accusing the appellees of "cherry picking" her file in the hopes of obtaining favorable reports from their reviewers. An administrator acts arbitrarily and capriciously when it "engages in a 'selective review of the administrative record' to justify a decision to terminate coverage." *Metro Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005)). On this point, however, her brief is somewhat confusing. For example, she complains that "[t]here is no indication that Ms. Goulbourne [the FCE examiner] received any medical documentation from Appellant's physicians which included their restrictions as to sitting and standing or any MRI results." However, the MRI of Curry's lower back and the restrictions on sitting and standing that she appears to

reference were produced *after* the FCE and the reviews of Drs. Cohen and Superfine. Moreover, as

the district court pointed out,

> [w]hile none of the peer reviewers physically examined Curry, each physician
> reviewed all of the documentation submitted to date in the case, and in their
> opinions they all list and describe the data they used to reach their conclusions.
> After each review step Curry had the opportunity to submit additional medical
> documentation to support her claim, and Broadspire never denied Curry's requests
> for extensions to submit documentation.

*Curry v. Eaton Corp.*, No. 1:07CV-5-R, 2007 WL 3231553, at *10 (W.D. Ky. Oct. 30, 2007).

Finally, Curry argues that her Functional Capacity Evaluation, performed after a personal

examination by Laura Goulbourne, was flawed in that it failed to test Curry's ability to function over

the course of an entire day, "much less an entire work week," and that it did not take into

consideration Curry's education, training, and mental health. However, there is nothing in the Plan's

definition of "disability" that requires any kind of prolonged testing of a claimant's physical

capacities, nor did it appear that a complete vocational assessment was the point of the FCE. Rather,

the burden of producing objective evidence under the plan was on Curry; the FCE results were used

in conjunction with the analysis provided by the reviewing physicians to conclude that the totality

of the objective evidence available did not demonstrate a disability.

D

Curry next argues that the plan administrator acted arbitrarily and capriciously by failing to

address the disability findings made by the Social Security Administration.

In *Bennett v. Kemper National Services, Inc.*, we indicated that

> if the plan administrator (1) encourages the applicant to apply for Social Security
> disability payments; (2) financially benefits from the applicant's receipt of Social

> Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.

514 F.3d 547, 553 (6th Cir. 2008). The *Bennett* court, in turn, was relying on *Glenn*, 461 F.3d at 667-68. According to *Glenn*, the rationale for according this factor any weight is that it serves as a form of quasi-estoppel:

> The grant of social security disability benefits . . . brings the case within the penumbra of the doctrine of judicial estoppel–that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. . . . If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration . . . . To further lighten that cost, it then turned around and denied that Ladd was totally disabled . . . . In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory.

*Ibid.* (quoting *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998)) (citations omitted by 6th Circuit).

Under the Plan, a participant's "monthly long term disability benefit from the Plan for any period of disability is reduced by the total amount[] of . . . [a]ny disability and/or old age benefits for which you are eligible under the federal Social Security laws . . . ." The plan requires participants to apply for Social Security benefits, to re-apply if Social Security denies the initial application, and to appeal if a re-application is denied. If a Plan beneficiary does not submit satisfactory evidence that she applied for Social Security benefits, her long-term disability benefits are reduced by an estimate of the amount she would be eligible to receive.

Janice Curry did, in fact, apply for Social Security disability benefits, and was eventually granted disabled status by the Social Security Administration on March 27, 1998. According to the Administrative Law Judge who decided Curry's appeal after her original applications were denied, Curry was suffering from bipolar disorder, as well as degenerative-disc disease with chronic back pain and sciatica. These ailments were considered "severe" under the Social Security Act. Additionally, the ALJ found that Curry's impairments prevented her from sustaining even sedentary work on a full-time basis, that she was unable to perform her past relevant work, that she did not have transferable skills to perform other work within her physical and mental functional capacity, and that, based on her residual functional capacity and vocational factors, there were no jobs existing in significant numbers that she could perform.

After Curry was awarded benefits by the SSA in 1998, Eaton benefitted financially; in addition to reducing Eaton's prospective financial burden under the terms of the Plan, it demanded and received reimbursement totaling $9,301.81 of disability benefits previously paid to Curry. There appears to be no explanation in any of the appellees' denial letters to Curry regarding decision to take a different position on her disability from that adopted by the SSA; therefore, under *Bennett*, we "should weigh this in favor of a finding that the decision was arbitrary or capricious."

Given that we *weigh* the failure to explain the decision, however (as opposed to the failure being arbitrary or capricious per se), we may give it greater or lesser weight, depending on the circumstances. In particular, it is notable that *Bennett* itself involved a situation in which a woman with multiple sclerosis was denied disability status by a claims administrator under the any-occupation standard less than a month *before* the Social Security Administration determined that she

was disabled within the meaning of the Social Security Act. In *Glenn*, meanwhile, the claimant was told that her long-term disability benefits were to be terminated less than two years after she had, with the plan's help, succeeded in obtaining Social Security disability benefits. Given that the purpose of weighing a failure to explain a plan's decision to take a contrary position from the SSA is to prevent it, as an interested party, from effectively committing fraud on the court by taking inconsistent positions to minimize its financial exposure, it makes perfect sense that a court should weigh an unexplained inconsistency heavily when those positions are taken in quick succession.

In this case, however, the contrast between the Plan's encouragement of Curry's Social Security claim and its subsequent denial of benefits is not nearly as stark, because six years elapsed from the time the SSA awarded benefits before Broadspire discontinued Curry's long-term disability benefits. Taking into consideration the quasi-estoppel nature of the rationale at issue, it seems unlikely that a plan would encourage a claimant to apply for Social Security disability benefits, bide its time for six years while paying its own share of disability benefits, and then cut those benefits off for no reason. More likely, it would seem, is the possibility that a 1998 decision as to a claimant's disability is simply not very relevant with respect to a 2004 decision on the same issue, particularly when numerous reports have been compiled in the interim.

Because a previous Social Security disability determination is a factor to be weighed, and not evidence of arbitrariness per se, and because the appellees in this case obtained a significant amount of new information about Curry's disability from numerous sources, we therefore consider Curry's SSA benefits determination to be a factor in her favor, but not a particularly significant one.

E

Curry's final argument with respect to the district court's decision on summary judgment is that Eaton acted arbitrarily and capriciously in denying her long-term benefits by relying in part upon two in-house vocational reports, an Employability Assessment Report and a Labor Market Report, that in turn were based on a limited subset of the medical information available at the time and made significant mistakes as to the geographic area in which Curry lived.

The district court explained that Curry's points as to these two reports were well-taken, and that a determination to deny benefits based on them *would* have been arbitrary and capricious. However, the court concluded,

> . . . it appears [to] the Court that the EAR and LMS are meant as aids for Plan participants whose benefits are denied or discontinued, and who must therefore reenter the work force. The EAR and LMS were not prepared by a medical professional, and therefore would not have assisted the Defendants in reaching a conclusion regarding Curry's disability. For these reasons, the inaccurate LMS and EAR are not determinative of the Court's decision here.

*Curry*, 2007 WL 3231553, at *11. Curry attempts to escape the district court's logic by pointing out evidence that Broadspire was awaiting these reports before making its initial determination to terminate benefits, and immediately terminated Curry's benefits when the reports were received. The record pages that Curry cites for support of this argument do contain a note dated April 21, 2004, by Isabel Venkatesan, the Claims Examiner, stating that "CE contacted Chau Nguyen-truong, FCM assigned to do LMS to obtain info on LMS . . . of employers contacted who had any openings available now. CE needs this info to be able to finish reviewing if EE is able to work or not."

As indicated above, however, our circuit merely requires that a plan offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not "disabled" *within the plan's terms*. *Elliott*, 473 F.3d at 617. The plan's terms do not require Eaton to identify a particular position that a claimant might fill before it determines that the claimant is not disabled, much less that such a position exists in a given geographic area. To that extent, even if the Claims Examiner had been waiting for the LMS results, there is no link between the conclusions contained therein and the basis for determining Curry's disability status.

Moreover, the actual language of the LMS seems to support the district court's interpretation. The LMS performed by Nguyen-truong concluded that "[s]ince Ms. Curry is released to *any* occupation within the Sedentary level, she should be able to do the following occupations: Cashier, Assembler, Stringing-Machine Tender, Label Pinker, Bander Hand, Plastic-Design Applier *and any other appropriate positions that fall within her restrictions*." Thus, the LMS does not indicate that the specific positions listed are the *only* ones that Ms. Curry could perform; rather, they are examples of positions falling within the "sedentary level." Because the Plan does not require the identification of specific jobs within a claimant's geographic area, their failure to do so does not render their decision arbitrary or capricious here, in a situation where they have obtained through proper sources a determination that the claimant can perform a broad range of jobs (i.e. sedentary work) and the specific jobs listed are merely illustrations of what a claimant *could* perform.

Curry further argues that the vocational reports prepared by Broadspire did not take into account her education, training, or experience. She reasons that, because the Plan's definition of "covered disability" requires her to be "totally and continuously unable to engage in any occupation

or perform any work . . . for which you are, or may become, reasonably well fitted by reason of education, training or experience—at Eaton Corporation or elsewhere," the Plan abused its discretion when it denied her benefits without demonstrating that the jobs it believed her capable of were available to someone with her education, training, and experience. In support of this proposition, she points to the report of her own vocational consultant, Stephen Schnacke, who reviewed the notes of Drs. Raque and Feltner, the FCE, the EAR, and the LMS. Schnacke's report, dated December 2, 2004, concludes that (1) Curry could not perform "clerical" work, as she had never done so in the past; (2) Edmonton, Kentucky is not within fifty miles of Louisville, Kentucky or Cincinnati, Ohio; (3) Curry's treating physicians' assessments indicate that she would be precluded from "any kind of full time employment;" (4) any gainful employment compatible with Curry's vocational profile would require that she attend work all day, nearly every day, which would be inconsistent with the conclusions reached by Curry's treating physicians and the results of the FCE; (5) the specific jobs identified in the LMS did not exist in significant numbers in Curry's area, and some of them were not typically classified as sedentary; and (6) the assessments of functioning by Curry's treating physicians precluded the performance of the jobs identified in the EAR and the FCE.

While Curry is correct that the Plan does specify that an occupation must be commensurate with a claimant's education, training, and experience, Broadspire appears to have taken those characteristics into account when evaluating whether the claimant was disabled. The EAR and the LMS, flawed as they were in their geographic scope, indicated that the assessor, Chau Nguyen-truong, performed a "Transferable Skills Analysis" that included a computerized transferable skills analysis application and a "transferability of work skills" worksheet. The report indicates that

"[t]hese vocational tools have been utilized to identify occupations that are feasible and within the scope of Ms. Curry's physical/functional capabilities and vocational background. The occupations identified in this Transferable Skills Analysis will be *further* analyzed to determine their appropriateness in regards to wage *and location*." (emphases added). Thus, the occupations identified by the EAR were appropriate given Curry's education, training, and experience. Nguyen-truong continued, "Ms. Curry's employment experiences and transferable skills are good due to that fact that she had been working in the production works and possesses a valid driver's license. Her employment history is consistent." Although, as indicated above, Broadspire's reports erred in finding specific examples of sedentary work within Curry's geographic region, it is nevertheless clear that she was reasonably well fitted for the *type* of work they exemplified by her transferable skills. Considering that "sedentary" work is an extremely broad category (as is "production work"), appellees were not arbitrary and capricious in concluding that Curry's education, training, and experience qualified her to perform at least one kind of sedentary occupation. To the extent that her vocational expert concluded otherwise, he appears to have been relying solely on the conclusions of Curry's treating physicians rather than on those of Broadspire's reviewing physicians. For the same reasons that Broadspire was entitled to discount the conclusions of Drs. Raque and Feltner, it was also entitled to discount the conclusions of a vocational expert that relied solely on those conclusions for information regarding the nature and extent of Curry's impairments.

F

The appellees have offered a reasoned explanation, based on the evidence, for their judgment that Curry was not "disabled" within the Plan's terms. In examining the reports of the reviewing physicians upon which the appellees relied, it appears that those reviewing doctors accepted the objective findings of Curry's treating physicians, came to a different conclusion as to their meaning, and discussed their reasons for disagreeing with the treating physicians to the extent necessary to satisfy our law. Although the appellee's encouragement of Curry to apply for Social Security benefits six years earlier weighs slightly in her favor, this is insufficient to outweigh the fact that she did not produce the necessary objective evidence of an inability to perform "any employment" to qualify as disabled under the Plan. The appellees were therefore not arbitrary and capricious in denying continuation of her long-term benefits.

**IV**

Finally, we address Curry's appeal of the district court's denial of her Rule 59(e) motion to alter or amend its judgment. We generally review the denial of such a motion for an abuse of discretion. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). When, as here, the Rule 59(e) motion seeks review of a grant of summary judgment, however, we apply a de novo standard of review. *Ibid.*

"Motions to alter or amend judgment may be granted if there is a clear error of law, newly discovered evidence, an intervening changing in controlling law, or to prevent manifest injustice." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (internal citations

omitted).  Curry argues that the basis for her motion is "to correct clear errors of law and to prevent a manifest injustice."

The "clear errors" of which Curry complains, however, seem to be identical with the issues she raises in her appeal of the district court's grant of summary judgment.  Indeed, her initial brief on appeal does not even discuss the denial of her Rule 59(e) motion separately, and her reply brief contains no issue or analysis substantively different from her appeal of the summary judgment decision.  For the same reasons that the district court did not err in granting summary judgment to the appellees, therefore, it also did not err in denying Curry's motion to alter or amend its judgment.

**V**

For these reasons, we **AFFIRM** the judgment of the district court.